**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **REBECCA HART and** | |
| **MICHAEL HART** | * |
| | * |
| Plaintiffs | * |
| | * |
| v. | * |
| | * |
| **BED BATH & BEYOND, INC., et al.** | * |
| | * |
| Defendants | * |
| | * |
| *************************************** | Civil No. **PJM 13-868** |
| **BED BATH & BEYOND, INC.** | * |
| | * |
| Third-Party Plaintiff | * |
| | * |
| v. | * |
| | * |
| **NHG LIQUIDATION, INC. F/K/A** | * |
| **NAPA HOME & GARDEN, INC., et al.** | * |
| | * |
| Third-Party Defendants | * |

<u>**MEMORANDUM OPINION**</u>

Rebecca and Michael Hart have sued Bed Bath & Beyond, Inc. ("BBB") for injuries sustained as a result of their friends' purchase and use of a product called "Firelites." BBB has in turn sued Losorea Packaging, Inc. ("Losorea") for common law indemnification and contribution,[1] and in response Losorea has filed a Corrected Motion to Dismiss for Lack of Personal Jurisdiction (Paper No. 33). The Court authorized jurisdictional discovery, asking the parties to submit supplemental briefing, and held a hearing. Following oral argument, the Court **DEFERRED** ruling on Losorea's Motion and permitted further jurisdictional discovery and

---

[1] BBB has also sued NHG Liquidation, Inc., f/k/a Napa Home and Garden, Inc. ("Napa" or "Napa Home & Garden") for breach of contract (Count 1) and breach of express warranty (Count 2); Randolph and Julie Stephens for common law indemnification and contribution (Count 3); and Napa, Fuel Barons, Inc. ("Fuel Barons") and Losorea for common law indemnification and contribution (Count 4) (Paper No. 19).

further supplemental briefing.  The Harts subsequently amended their Complaint to add Losorea, Ashland, Inc. ("Ashland"), and CKS Packaging, Inc. ("CKS") as direct Defendants to the action. Various cross-claims followed.[2]

Losorea has now moved to dismiss the Harts' Second Amended Complaint for lack of personal jurisdiction, incorporating by reference the arguments Losorea set forth in support of its Motion to Dismiss against BBB.  The Harts adopt the arguments BBB made in opposition to Losorea's Motion to Dismiss filed against it.  Losorea has also moved to dismiss BBB's cross-claims for lack of personal jurisdiction, as well as on the grounds that the cross-claims are duplicative of BBB's third party claims.  Having reviewed the parties' pleadings, the Court **DENIES** Defendant Losorea's Corrected Motion to Dismiss for Lack of Personal Jurisdiction (Paper No. 33), **DENIES** its Motion to Dismiss Second Amended Complaint Filed by Plaintiffs for Lack of Personal Jurisdiction (Paper No. 92), and **DENIES** its Motion to Dismiss Cross-Claims (Paper No. 99).

## I.

The case arises out of a visit by the Harts to the home of their friends Randolph and Julie Stephens in Calvert County, Maryland over the Memorial Day weekend in 2011.  The Harts were sitting outside near a "Firelites" firepot when one of their hosts began re-filling the pot with citronella "pourable eco-fuel gel."  The "pourable eco-fuel gel" ignited, then allegedly exploded into a six to eight foot fireball, which caused extensive burns to Rebecca Hart and singed Michael Hart's leg hair.

The Harts allege that the "Firelites" fire pot was purchased at BBB, that the "pourable fuel-gel" was produced by Fuel Barons, and that the fuel gel and fire pot were packaged by

---

[2] BBB has filed cross-claims against Ashland, CKS, and Losorea (Paper No. 91).  CKS has filed cross-claims against BBB and against Randolph and Julie Stephens (Paper Nos. 103, 104).

Losorea under the label of Napa Home & Garden.  The Harts additionally allege that CKS designed and manufactured the bottle caps used to seal the bottle of fuel gel, and that the fuel gel contained a product ("Klucel®") manufactured by Ashland as a gelling agent.

The Harts initially filed suit against BBB, which turn filed a Third Party Complaint against Napa Home & Garden, Fuel Barons, Losorea, and Randolph and Julie Stephens.  The Harts' Second Amended Complaint adds Losorea, Ashland, and CKS as direct Defendants.

Losorea has moved to dismiss all claims against it for lack of personal jurisdiction.

While the precise contours of Losorea's involvement in the manufacturing or packaging of the fuel gel remain in dispute, the parties agree that, while Losorea, a Georgia corporation, did not directly sell the fuel pot and fuel gel to customers in Maryland, these components were still sold through third-party distributors in this state.[3]  Losorea and BBB agree that, at a minimum, Losorea contracted with Fuel Barons to package the fuel gel.  The parties likewise agree that Fuel Barons shipped the product to Napa, which supplied the product to BBB for nationwide sale.  BBB contends that Losorea did more than simply bottle the fuel gel, that it in fact "manufactured" the gel.  According to BBB, Losorea received components of the fuel gel from various suppliers, blended the products pursuant to a formula, ensured that the ingredients were proportioned appropriately, and tested the viscosity and quality of the gel, all in addition to simply bottling the product.  Losorea submits that Fuel Barons was the manufacturer of the fuel gel, and that Losorea did not conduct any safety testing of the product.

All this said, the Court need not decide the extent of Losorea's actual involvement with the product in order to decide whether personal jurisdiction obtains in this Court.

---

[3] Losorea apparently became CyCan Industries in December 2012.  According to Leigh Fragnoli, former CEO of Losorea, Losorea's assets were sold to CyCan in March 2013.  The current President of CyCan is Ryan Dailey, Fragnoli's stepson. BBB Supplemental Br. in Opp. Ex. 12 (Paper No. 58) (Fragnoli Dep. 8:18-10:20).

## II.

"When a court's personal jurisdiction is properly challenged by a Rule 12(b)(2) motion, the jurisdictional question thus raised is one for the judge, with the burden on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989).

## III.

A federal court in a diversity case may exercise personal jurisdiction over a non-resident defendant if (1) the exercise of jurisdiction is authorized under the state's long-arm statute; and (2) the exercise of jurisdiction comports with the due process requirements of the Fourteenth Amendment. *Christian Sci. Bd. of Dirs. of the First Church of Christ v. Nolan,* 259 F.3d 209, 215 (4th Cir. 2001). "The Maryland courts have consistently held that the state's long-term statute is coextensive with the limits of personal jurisdiction set by the due process clause of the Constitution. Thus, our statutory inquiry merges with our constitutional inquiry." *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc*., 334 F.3d 390, 396-97 (4th Cir. 2003) (citations omitted). The parties agree that a finding of personal jurisdiction here turns on the limits of due process.

Consistent with due process, a court may subject non-resident defendants to judgment only when defendants have "certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*., 326 U.S. 310, 316 (1945). If the claims "arise out of or are connected with the activities within the state," *id*. at 319, then those contacts may establish specific jurisdiction. The Court considers: "(1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those

activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *Carefirst*, 334 F.3d at 397.  A court may exercise general jurisdiction over a non-resident defendant who maintains "continuous and systematic" contacts with the forum state, regardless of whether the claims "arise out of" the defendants' activities in the forum state.  *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984).

The Fourth Circuit interpreted the Supreme Court's so-called "stream of commerce" doctrine in *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) and *Asahi Metal Industry Co. v. Superior Court of Cal.*, 480 U.S. 102, 107 (1987) and held that the relevant question is "whether . . . the defendant has created a substantial connection to the forum state by action purposefully directed toward the forum state or otherwise invoking the benefits and protections of the laws of the state." *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 945-46 (4th Cir. 1994).

In June 2011 the Supreme Court revisited its "stream of commerce" jurisprudence in *J. McIntyre Machinery Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011).  As in *Asahi*, the Supreme Court did not produce a majority opinion.  Justice Kennedy authored the plurality opinion, joined by Chief Justice Roberts and Justices Scalia and Thomas.  Under the plurality's approach, a "defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have *targeted the forum*; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State." *Id*. at 2788 (emphasis added). The plurality rejected "foreseeability [as] the touchstone of jurisdiction," *id*., finding that instead "it is the defendant's actions, not his expectations, that empower a State's courts to subject him to judgment." *Id*. at 2789.  The inquiry, then, should focus on "whether a defendant has followed

a course of conduct directed at the . . . jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct." *Id.*

Justice Breyer, concurring, rejected what he saw as the plurality's "strict no-jurisdiction rule," *id.* at 2793, and stated that "resolving this case requires no more than adhering to our precedents." *Id.* at 2792.  He found that on the facts of *McIntyre*, it had not been shown that the foreign manufacturer "purposefully availed itself of the privilege of conducting activities" within the forum state, "or that it delivered its goods in the stream of commerce 'with the expectation that they will be purchased'" by its users.  *Id.* at 2792 (quoting *World-Wide Volkswagen*, 444 U.S. at 297-98).  He observed that while "many recent changes in commerce and communication, many of which are not anticipated by our precedents" might require rethinking the present law, such "serious commercial consequences . . . are totally absent in this case." *Id.* at 2791-93.

At the same time, Justice Breyer rejected the New Jersey Supreme Court's approach under which a producer "would be subject to jurisdiction for a products-liability action so long as it 'knows or reasonably should know that its products are distributed through a nationwide distribution system that *might* lead to those products being sold in any of the fifty states.'" *Id.* at 2793 (original emphasis).  Justice Breyer was concerned that the lower court's broad approach could impose jurisdiction on "any domestic manufacturer who sells its products . . . to a national distributor, no matter how large or small the manufacturer, no matter how distant the forum, and no matter how few the number of items that end up in the particular forum." *Id.*  He rejected that approach as "rest[ing] jurisdiction . . . upon no more than the occurrence of a product-based accident in the forum State." *Id.*

This Court finds that Justice Breyer's concurrence, joined by Justice Alito, is what controls here. *See Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'") (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)). *Accord Ainsworth v. Moffett Engineering, Ltd.*, 716 F.3d 174, 178 (5th Cir. 2013) (finding that in *McIntyre*, Justice Breyer's concurrence controls); *AFTG-TG, LLC v. Nuvoton Tech. Corp.*, 689 F.3d 1358, 1363 (Fed. Cir. 2012); *Windsor v. Spinner Indus. Co., Ltd.*, 825 F. Supp. 2d 632, 637-38 (D. Md. 2011).

The Court holds that, under appropriate fact patterns, a forum state may exercise personal jurisdiction over an out-of-state manufacturer[4] of products that are sold in the forum state by third party distributors.

BBB asserts that it sold 1,992 bottles of fuel gel either manufactured or bottled by Losorea in Maryland by BBB.  BBB Second Supplemental Br. in Opp. Ex. 30 (Paper No. 98) (showing 763 bottles sold of "gel fuel" and 1,229 bottles sold of "citro gel" in 17 different cities in Maryland).  While Losorea argues that BBB has provided no documentation relating to these sales and cannot substantiate the accuracy of those figures, Losorea, for its part, has provided the Court no documentation undermining BBB's assertions, and there is nothing in the record that suggests that the fuel gel purchased by the Stephens was a "single isolated sale," *McIntyre*, 131 S. Ct. at 2792 (J. Brennan).[5]  *See also Ainsworth*, 716 F.3d at 179 (finding personal jurisdiction

---

[4] The Court does not find, one way or another, that Losorea's involvement with the fuel gel "meets the definition of manufacturing in Maryland" as is alleged by BBB.  BBB Supplemental Br. in Opp. 18 (Paper No. 58) (citing the Code of Maryland Regulations ("COMAR"), 18.03.05.02(B)(2)(a) (2013)). Any such reference to Losorea as a "manufacturer" is for ease of reference.

[5] Restoration Hardware, a nationwide chain, also sold the fuel gel and "Firelights" product, but it is unknown how many bottles of fuel gel—if any—were sold by Restoration Hardware in Maryland.

over non-resident defendant who sold 203 forklifts—through a distributor—to customers in

Mississippi, consisting of approximately 1.55% of defendant's sales during that period).

        This is not a case in which it was merely foreseeable to Losorea that the fuel gel might

wind up in Maryland. For jurisdictional purposes at least, the Court finds that Losorea knew that

the fuel gel would ultimately be distributed by BBB, a national retailer. Losorea packaged and

labeled bottles of fuel gel with BBB's price tag on them. *See* BBB Second Supplemental Br. in

Opp. (Paper No. 98) at Ex. 9 (picture of the fuel gel with BBB sticker affixed); Ex. 12 (Fragnoli

Dep. 22:13-23:1, 47:5-48:8) (Losorea's owner admitted that BBB stickers were affixed to fuel

gel when Losorea applied the Fire Gel label); Ex. 6 (Hammond Dep. 232:19-233:13) (Losorea's

owner received an e-mail stating that Napa was selling the fuel gel to BBB and the labels will

have to be modified accordingly); Ex. 25 (e-mail to Ryan Dailey, Losorea employee and current

CyCan Industries President, requesting a shipment be prepared for BBB).  Losorea concedes that

it affixed labels containing BBB's name on the bottles of fuel gel, and while it argues that this

knowledge at most shows that it was foreseeable to it that the product would be sold to

customers in Maryland, as opposed to showing a targeting of the forum, Tr. 24:14-20, 25:4-16,

Apr. 17, 2014 (Paper No. 72), the Court disagrees.

        Losorea misapprehends the thrust of *McIntyre*.  The present case is not one in which a

lone item or just a few items happened to wind up in this state.  Instead, this case folds into the

scenario portrayed by Justice Breyer, where a defendant, "instead of shipping the products

directly, . . . consigns the product through an intermediary . . . who then receives and fulfills the

orders." *McIntyre*, 131 S. Ct. at 2793.

        Not only is this case distinguishable from *McIntyre*; it is in harmony with the only case

from this District that has considered personal jurisdiction in the "stream of commerce" context

post-*McIntyre*, *Windsor v. Spinner Indus. Co., Ltd.*, 825 F. Supp. 2d 632 (D. Md. 2011).  In

*Windsor*, Judge Bredar found that jurisdiction did not lie over a Taiwanese manufacturer where

the court had "no details about the particular chain of distribution that brought the allegedly

defective" product to the Maryland store where it was purchased by plaintiffs, and where the

third party distributors and manufacturers had "no connection whatever to this case." *Id.* at 639.

        In contrast to the foreign manufacturer in *Windsor*, in this case Losorea relied on a clearly

defined network of distributors for the ultimate sale of the fuel gel in Maryland, and in doing so

"invoke[ed] the benefits and protections of the laws of the state." *Lesnick*, 35 F.3d at 946.  BBB,

in sum, has shown that Losorea had an ongoing and intentional commercial relationship with

Fuel Barons, and through Fuel Barons, with Napa and BBB.  At a minimum, Losorea bottled and

packaged the fuel gel knowing that BBB would sell the fuel gel in its stores, and BBB in fact

sold 1,992 bottles of fuel gel in Maryland.  "From these ongoing relationships, it can be

presumed that the distribution channel formed by [Losorea, BBB and others] was intentionally

established, and that defendant[] knew, or reasonably could have foreseen, that a termination

point of the channel was [Maryland]." *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d

1558, 1564 (Fed. Cir. 1994); *AFTG-TG, LLC*, 689 F.3d at 1363, 1365 (adhering to *Beverly Hills

Fan* precedent post-*McIntyre*).  Losorea cannot disavow the clearly defined chain of distribution

it established in this state in order to avoid having to be haled into court here.

        The Court finds that it has specific jurisdiction over Losorea.

        The Court wishes to make clear, however, that it is only finding specific, not general

jurisdiction over Losorea.  BBB argues that general jurisdiction should be found because Losorea

maintained a website that advertised its products as being found "worldwide" (although no direct

sales were made through its website), including listing products which are VOC (Volatile

Organic Compounds) compliant and may be sold in Maryland.  BBB also argues that Losorea generated over $71,000 in revenue from the sale of its products to persons or entities in Maryland—Losorea claims it was only $62,426.17—and purchased $13,926.00 worth of goods from Maryland. The Court declines to find that these facts demonstrate the sort of "continuous and systematic" contacts with Maryland that would justify an assertion of general jurisdiction over Losorea.

## IV.

Losorea also argues that the cross-claim filed against it by BBB should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) because the cross-claim is identical to the claim in BBB's Third-Party Complaint.  Losorea's lone citation in support of this argument comes from the U.S. District Court, Southern District of New York, which dismissed one of two duplicative claims contained within the same complaint. *See Aramony v. United Way of Am*., 949 F. Supp. 1080, 1084 (S.D.N.Y. 1996).  But Losorea has cited no case in which a cross-claim was dismissed as duplicative of a third party complaint. The Court holds that BBB may pursue a cross-claim against Losorea under Fed. R. Civ. P. 13(g).  Losorea will suffer no hardship in defending the claims asserted against it which, by its own admission, involve identical legal theories arising out of identical facts.

## V.

For the foregoing reasons, the Court **DENIES** Defendant Losorea Packaging, Inc.'s Corrected Motion to Dismiss for Lack of Personal Jurisdiction (Paper No. 33), **DENIES** Defendant/Third-Party Defendant Losorea Packaging, Inc.'s Motion to Dismiss Second Amended Complaint Filed by Plaintiffs for Lack of Personal Jurisdiction (Paper No. 92), and

**DENIES** Defendant/Third-Party Defendant/Cross-Claim Defendant Losorea Packaging, Inc.'s

Motion to Dismiss Cross-Claims (Paper No. 99).

A separate Order will **ISSUE**.


                                                        /s/
                                                **PETER J. MESSITTE**
**September 22, 2014**                          **UNITED STATES DISTRICT JUDGE**